# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SPECIALTYCARE, INC.; REMOTE NEUROMONITORING PHYSICIANS, PC; and SENTIENT PHYSICIANS, PC,<br><br>Plaintiff,<br><br>v.<br><br>MEDCOST, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 2025-0011-DH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **REPORT**

Report:  February 16, 2026
Date Submitted: December 02, 2025

Jeffrey J. Lyons, Michael E. Neminski, BAKER & HOSTETLER LLP, Wilmington, DE; *Attorneys for Plaintiffs Specialtycare, Inc., Remote Neuromonitoring Physicians PC, and Sentient Physicians, PC*.

John M. Seaman, Florentina D. Field, ABRAMS & BAYLISS, Wilmington, DE; Bradley A. Rohrenbeck, Chase Stevens, KILPATRICK, TOWNSEND AND STOCKTON, LLP, Winston-Salem, NC; *Attorneys for Defendant MedCost, LLC*.

**HUME, IV, M.**

Today, the Court addresses a narrow question of first impression in Delaware: whether the Federal No Surprises Act contains an implied private right of action to enforce awards determined under the Internal Dispute Resolution Process. [1] While Plaintiff seeks enforcement of the awards by appeal to the Court of Chancery's exclusive jurisdiction to enforce arbitration agreements, the statutory dispute resolution process differs from arbitration as defined in the Federal Arbitration and Delaware Uniform Arbitration Acts. Moreover, under the principles of statutory interpretation promulgated by the U.S. Supreme Court in *Alexander v. Sandoval*[2] and in keeping with several District Court decisions interpreting the No Surprises Act, this Court declines to create a private right of action. These counts are dismissed. The Court further dismisses Plaintiff's three alternative causes of action for failure to state a claim under Court of Chancery Rule 12(b)(6).

---

[1] *See* 42 U.S.C. §§ 300gg-111 *et seq.*

[2] 532 U.S. 275, 286 (2001). As discussed *infra*, Delaware courts have long followed federal precedent in determining whether a private right of action exists. *See, e.g., Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1064 (Del. 1986).

2

## I.  BACKGROUND[3]

Plaintiffs SpecialtyCare, Inc., Remote Neuromonitoring Physicians, PC, and Sentient Physicians, PC initiated this action against Defendant MedCost, LLC.  The facts are drawn from the Verified Complaint and are taken to be true for the purposes of this Motion to Dismiss.

### A.  Content and Structure of the No Surprises Act

In late 2020, the President signed into law the No Surprises Act ("NSA" or "Act") to defray consumer costs arising from "unexpected out-of-network medical bills."[4]  The Act limits "the amount an insured patient will pay for emergency services furnished by an out-of-network provider." *Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 654 F. Supp. 3d 575, 580 (E.D. Tex. 2023).  The Act also limits how much an insured party pays for "certain non-emergency services furnished by an out-of-network provider at an in-network facility." *Texas Med.*

---

[3] Unless otherwise noted, pleadings are cited by reference to items docketed in C.A. No. 2025-0011-DH ("D.I.").  At the time of this ruling, only the draft transcript has been prepared and citations to it refer to the rough copy of the transcript ("Draft Tr."), D.I. 30.  Citations in the form of "Compl." refer to Plaintiff's Verified Complaint, D.I. 1.  Citations in the form of "DOB" refer to Defendant's Brief in Support of Motion to Dismiss, D.I. 13.  Citations in the form of "PAB" refer to Plaintiff's Answering Brief in Opposition to Defendant's Motion to Dismiss, D.I. 20.  Citations in the form of "DRB" refer to Defendant's Reply Brief in Support of Motion to Dismiss, D.I. 22.  Here, "Supreme Court" refers to the U.S. Supreme Court rather than the Delaware Supreme Court.

[4] *The No Surprises Act at a Glance: Protecting Consumers Against Unexpected Medical Bills*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Jan. 2025), https://www.cms.gov/files/document/nsa-at-a-glance.pdf.

*Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 767 (5th Cir. 2024) (quoting *Texas Med. Ass'n*, 654 F. Supp. 3d at 580).  The Act went into effect on January 2, 2022.[5]  In situations where an insured person incurs emergency medical costs out of network ("OON")[6], the NSA crafted a procedure for the healthcare provider and insurer to allocate costs.  Initially, insurance plans and issuers may pay the OON provider whatever amount they prefer.[7]  If the healthcare provider wishes to contest the insurer's initial payment, the provider "initiate[s] open negotiations" within thirty days of the payment.  42 U.S.C. § 300gg-111(c)(1)(A).  Where the open negotiations period fails to resolve the payment dispute, either party can initiate the Independent Dispute Resolution Process ("IDR"), a "baseball-style"[8] resolution process where a third-party referee ("IDR Entity") determines the amount owed by

---

[5] Compl. ¶ 9.

[6] An example of this is when an emergent patient is airlifted to a medical facility by an OON medical transport helicopter.

[7] Compl. ¶ 10.  Although the NSA applies both to insurance plans and issuers, the opinion refers just to "plans" for ease of reading.

[8] "Baseball-style" arbitration refers to the arbitration process employed by Major League Baseball.  In that proceeding, the team and player each submit a proposed salary figure to a panel of arbitrators.  The arbitration panel chooses the player's or team's proposal and is not free to select a figure not suggested by one of the sides.  *See Salary Arbitration and Arbitration Eligibility*, MLB.COM https://www.mlb.com/glossary/transactions/salary-arbitration (last visited Feb. 16, 2026).

the plan.[9] *Id.*, § 300gg-111(c)(1)(B).  Either the parties or the Department of Health and Human Services selects the IDR entity.  42 U.S.C. § 300gg-111(c)(4); *Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271, 273 (5th Cir. 2025) (discussing the NSA's structure).

During the IDR process, each party submits an offer for what is owed and any additional information requested by the IDR Entity.  Then, the IDR Entity selects one of the offers following consideration of numerous statutorily prescribed considerations.  42 U.S.C. §§ 300gg-111(c)(5)(A), (C)(i)–(ii).  The IDR Entity's determination is binding on the parties "in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim[.]"  *Id.* § 300gg-111(c)(5)(E)(i)(I).

     **1.**    **The IDR statute incorporates one provision of the Federal Arbitration Act for judicial review of IDR entity's decision in cases of fraud, mistake, or corruption.**

The NSA provides that the determination "shall not be subject to judicial review" except for the circumstances described in 9 U.S.C. Section 10(a)(1)–(4).  42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).  Section 10 is a provision of the Federal Arbitration Act ("FAA"), which provides in relevant part:

---

[9] The Complaint incorrectly refers to the IDR Entity as a "third-party arbitrator."  ¶ 10.  As I explain *infra*, the IDR Entity is not an arbitrator but a distinct third-party resolution process unique to the NSA's statutory framework.

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
    (1) where the award was procured by corruption, fraud, or undue means;
    (2) where there was evident partiality or corruption in the arbitrators, or either of them;
    (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
    (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Thus, the NSA incorporates one discrete provision of the FAA so that Courts may reverse the IDR Entity's determination in situations of exceptional misconduct.

The NSA includes an administrative accountability mechanism for situations of misconduct not contemplated by 9 U.S.C. Section 10. The Secretaries of Health and Human Services ("HHS"), Labor, and Treasury may submit reports to Congress regarding plans that engage in "a pattern or practice of routine denial, low payment, or down-coding of claims," with "recommendations on ways to discourage such a pattern or practice." 42 U.S.C. § 300gg-111(c)(5)(E)(iv).

### 2. The Federal and Delaware Uniform Arbitration Acts provide causes of action for enforcement of arbitration decisions.

While the NSA limits judicial review to cases involving misconduct, parties subject to an arbitrator's decision under the FAA may seek judicial confirmation or review. 9 U.S.C. Section 9 permits any court of competent jurisdiction to enter an

6

order confirming a valid arbitration award "unless the award is vacated, modified or corrected as prescribed in section 10 and 11 of this title."[10] The FAA contemplates that the prevailing party in arbitration can obtain a Court order confirming the award, unless a party seeks to alter or vacate the arbitrator's decision, in which case the parties properly proceed under Section 10 (vacating an award on grounds of misconduct) or Section 11 ("modifying or correcting an award" on grounds of mistake, miscalculation, or overbreadth).

The Delaware Uniform Arbitration Act ("DUAA")[11] provides comparable jurisdiction for a court to modify, confirm, or vacate an award. The Delaware Court of Chancery has exclusive jurisdiction for judicial review of DUAA arbitrations absent express agreement of the parties. *See* 10 *Del. C.* § 5702(a). The requirements for confirmation of an arbitrator's decision largely mimics the FAA, where a party need only make its application to the reviewing court within one year of the arbitrator's decision. *Id.* § 5713. The non-prevailing party in a DUAA action may

---

[10] The FAA permits parties to designate the reviewing court, with the "United States court in and for the district within which such award was made" functioning as the default venue absent express stipulation. 9 U.S.C. § 9. For parties seeking vacatur of the arbitrator's decision under Section 10 of the FAA, however, "the United States court in and for the district wherein the award was made" has exclusive jurisdiction. When a party seeks judicial review or confirmation in Delaware state court, however, the Court of Chancery is vested with exclusive jurisdiction. *See* 10 *Del. C.* § 5702(c).

[11] 10 *Del C.* § 5701 *et seq.* The Court of Chancery possesses jurisdiction to confirm and review arbitration awards under the FAA, provided the parties agreed to jurisdiction within Delaware. *Id.* § 5702.

seek vacatur of the award on the same grounds established within the FAA. *Compare* 10 *Del. C.* § 5714(a)(1)-(5), *with* 9 U.S.C. § 10(a)(1)–(5). The DUAA modification or correction statute also largely parallels the FAA's, although the DUAA imposes a ninety-day time limit to seek such amendment. *Compare* 10 *Del. C.* § 5715(a)(1)–(3), *with* 9 U.S.C. § 11(a)–(c).

Regardless of whether an arbitration proceeds under the FAA or the DUAA, the relevant statutes provide an express cause of action for any arbitrating party to confirm, vacate, or modify the award.

### B. SpecialtyCare and MedCost engaged in numerous IDR processes to resolve payment disputes.

SpecialtyCare, Inc. ("SpecialtyCare") is a Delaware corporation with its principal place of business in Brentwood, Tennessee. SpecialtyCare is a health care provider of intraoperative neuromonitoring throughout the United States.[12] SpecialtyCare claims that it "insures and administers health insurance products and benefit plans."[13] SpecialtyCare has two affiliate entities: Remote Neuromonitoring

---

[12] Compl. ¶ 3.

[13] *Id.*, ¶ 4. MedCost argues in its briefing that it is not a licensed insurer but a "standalone preferred provider network" that contracts with providers to "provide network access to insurers and third-party health plan administrators . . . ." DOB, at 3. MedCost explains that it is not listed among Insurance Companies on North Carolina's administrative database. *See* North Carolina Dep't of Ins., *Listing of Insurance Companies and Oher Regulated Entities*, tps://www.ncdoi.gov/insurance-industry/financial-

8

Physicians, PC ("Remote Neuromonitoring"), a Pennsylvania entity, and Sentient Physicians, PC ("Sentient Physicians"), an Illinois entity, both with their principal place of business in Brentwood, Tennessee.[14] MedCost, LLC ("MedCost"), is a Delaware LLC with its principal place of business in Winston-Salem, North Carolina.[15]

Following the NSA's implementation, SpecialtyCare engaged in multiple IDR determinations with MedCost.[16] Following such determinations, MedCost owes $198,871 to SpecialtyCare that remains unpaid.[17] SpecialtyCare further claims that it continues to engage in transactions with MedCost, and that it expects further IDR determinations, which may increase the debt owed.[18]

---

analysis/listinginsurance-companies-and-other-regulated-entities; DOB, at 3 n.2. While I can properly take judicial notice of publicly available facts not subject to reasonable dispute, I decline to resolve the parties' dispute whether MedCost is or is not a Group Health plan subject to the NSA's IDR proceedings and limit the factual scope of my analysis to the pleadings. *Cf. In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 171 (Del. 2006) (affirming the Trial Court's decision to take judicial notice of stockholder vote totals memorialized in an SEC Form 10-Q because it was not subject to reasonable dispute); D.R.E. 201.

[14] *Id.*, ¶ 3.

[15] *Id.*, ¶ 4.

[16] *Id.*, ¶¶ 13, 16.

[17] *Id.*, ¶ 15. SpecialtyCare submitted a chart identifying all unpaid IDR awards between the parties. *See id.*, Ex. A.

[18] *Id.*, ¶¶ 20–21.

SpecialtyCare claims that MedCost initially makes low payments when OON claims are submitted, in the hope that SpecialtyCare will neglect to pursue the NSA's resolution process, thereby limiting MedCost's overall liability.[19] Even where SpecialtyCare does seek IDR resolution for the disputed claims and the IDR entity determines the award, MedCost delays payment past the thirty-day statutory deadline.[20]

### C. SpecialtyCare files suit before this Court to confirm the awards or obtain alternate relief.

Following MedCost's failure to remit payment for the IDR determinations, SpecialtyCare brought suit in this Court on January 3, 2025, alleging five counts.[21] SpecialtyCare brings two counts seeking confirmation of the IDR awards under DUAA Section 5702 and FAA Section 9.[22] In addition to this order, SpecialtyCare looks to obtain pre- and post-judgment interest on the balance of unpaid awards under 28 U.S.C. § 1961. In the alternative, SpecialtyCare seeks relief on three

---

[19] *Id.*, ¶¶ 22–23.

[20] *Id.*, ¶ 24.

[21] *See id.*

[22] *Id.*, ¶¶ 27–40.

grounds: first, under the theory of an account stated,[23] second, on grounds of quantum meruit,[24] and third, on grounds of unjust enrichment.[25]

MedCost filed a Motion to Dismiss for failure to state a claim on May 28, 2025.[26] The matter was reassigned to me on October 8, 2025,[27] and I heard argument on the Motion to Dismiss on December 2, 2025.[28] I initially took the matter under advisement and now recommend granting MedCost's Motion to Dismiss for the reasons articulated below.

## II.    ANALYSIS

The standard for a motion to dismiss is well-settled. When reviewing a motion to dismiss under Court of Chancery Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as well pleaded if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (internal

---

[23] *Id.*, ¶¶ 41–52.

[24] *Id.*, ¶¶ 53–66.

[25] *Id.*, ¶¶ 67–80.

[26] D.I. 13.

[27] D.I. 24.

[28] D.I. 30.

11

citations omitted). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable conceivability." *Id.* at 537 (internal citations omitted). The reasonable conceivability standard grants a plaintiff "all reasonable inferences that logically flow from the face of the complaint" but does not obligate the Court "to accept every strained interpretation of the [plaintiff's] allegations." *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). The Court will "ignore conclusory allegations that lack specific supporting factual allegations." *FMLS Hldng. Co. v. Integris BioServices, LLC*, 2023 WL 7297238, at *5 (Del. Ch. Oct. 30, 2023) (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998). Dismissal is appropriate where "the [nonmoving party] would not be entitled to recover under any reasonably conceivable set of circumstances." *AECOM v. SCCI Nat'l Hldngs., Inc.*, 2023 WL 6294985, at *6 (Del. Ch. Sep. 27, 2023) (quoting *Central Mortg. Co.*, 27 A.3d at 535).

**A. The NSA provides neither an express nor implied private right of action to confirm IDR Entity Awards. Thus, SpecialtyCare's Counts I and II to confirm the awards is dismissed.**

I first turn to whether MedCost possesses proper grounds to seek enforcement of the IDR before this Court. While the briefings attend to whether an implied private right of action arises under the NSA, I must first consider whether the Court of Chancery has subject matter jurisdiction. SpecialtyCare brought two counts for

enforcement of the IDR determination under FAA Section 9 and DUAA Section 5702 respectively, which contain essential jurisdictional elements. While I hold that this Court lacks subject matter jurisdiction, I hold in the alternative that SpecialtyCare failed to state a claim because the NSA does not give rise to an implied private right of action.

### 1. The parties lack an arbitration agreement. Thus, the Court lacks subject matter jurisdiction over SpecialtyCare's motion to confirm the IDR Entity's Order.

The threshold question is whether an IDR proceeding is an arbitration subject to this Court's confirmation under 10 *Del. C.* § 5702(c). If an IDR proceeding materially differs from an arbitration, then I cannot confirm the award under the FAA's Section 9 authority or the comparable DUAA Section 5713. Because an IDR proceeding is not an arbitration, I dismiss Counts I and II for want of subject matter jurisdiction.

While MedCost stylizes its Motion to Dismiss as failure to state a claim under Court of Chancery Rule 12(b)(6), subject matter jurisdiction is "crucial," and [the Court] must "ensure it exists, even if it must raise the issue *sua sponte*." *Critchfield v. Engfer*, 2016 WL 2755933, at *1 (Del. Ch. May 9, 2016) (quoting *Appoquinimink Educ. Assoc. v. Appoquinimink Sch. District*, 2003 WL 1794963, at *3 (Del. Ch. Mar. 31, 2003), *corrected* (Apr. 17, 2003), *aff'd,* 844 A.2d 991 (Del. 2004); Ct. Ch.

13

R. 12(h)(1) ("A party may assert a defense under Rule 12(b)(1) motion filed at any time, or the Court may raise the defense on its own initiative").

A brief look at the history of the FAA reveals that IDR proceedings are not arbitrations because an agreement to arbitrate must arise out of a contract.  Section 2 comprises the "primary substantive provision of the Act," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983), and provides in relevant part:

> A written provision in any maritime transaction *or a contract* evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of such contract* or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.  9 U.S.C. § 2 (emphasis added).

Notably, a contract envelops the ensuing arbitration proceeding by both providing (1) the gravamen subject to arbitration and (2) the agreement to arbitrate itself.  The Supreme Court has maintained the "fundamental principle that arbitration is a matter of contract, *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) and consequently "place[s] arbitration agreements on an equal footing with other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). Parties may specify the scope of agreements to arbitrate, including (1) the matters subject to arbitration, (2) the rules by which arbitration is conducted, and (3) the parties bound by the arbitration agreement. *See AT&T Mobility LLC v. Concepcion*, 562 U.S. 333, 344 (2011) (first citing *Mitsubishi Motors Corp. v. Soler Chrysler-*

14

*Plymouth, Inc.*, 473 U.S. 614, 628 (1985), then *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989), and finally *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681–82 (2010)).

Delaware law buttresses the requirement that an agreement to arbitrate must exist for such arbitration to be enforceable. *See SBC Interactive, Inc. v. Corp. Media P'rs*, 1997 WL 81008, at *2 (Del. Ch. 1997) ("Because the obligation or right to contract is contractual, the starting point of any analysis of whether a dispute is arbitrable must be the parties' contract to arbitrate."); *Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 356 (Del. Ch. 2023) (underscoring the Supreme Court's threshold requirement of "determin[ing] whether an arbitration agreement exists in the first place.") (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 139 (2019)). As in the FAA, the DUAA requires "a written agreement to submit to arbitration" for an enforceable obligation under the Act to exist. 10 *Del. C.* § 5701. The statute's text conditions the Court of Chancery's jurisdiction to enforce an arbitrator's decision on the existence of such agreement. *See id.*

Both Federal and Delaware law emphasizes the contractual nature of an arbitration agreement and the requirement of a contract for any arbitration proceeding to exist. Here, however, SpecialtyCare has failed to plead the existence of a written agreement between itself and MedCost. Other courts considering the question of judicial review of the NSA's IDR process have admitted the absence of

15

such agreement. *See, e.g.*, *Guardian Flight LLC v. Aetna Life Ins. Co.*, 789 F. Supp. 3d 214, 227, (D. Conn. 2025).[29] Instead, SpecialtyCare points to the statutory structure of the NSA, which provides for an IDR process that allocates costs between the insurer and the healthcare provider. While the NSA provides for third-party dispute resolution between the parties, "arbitration" is not a mere colloquialism in the DUAA's grant of jurisdiction to the Court of Chancery over arbitration awards. As both the FAA and DUAA evidence, a written agreement to arbitrate is a necessary condition for an arbitration to exist, and the respective grants of jurisdiction to review arbitration decisions in state and federal statutory schemes rely on a written agreement, which the parties lack in this case.

SpecialtyCare relies on two district court decisions outside the NSA context for the proposition that the Court has authority to confirm a "final and binding award."[30] In *New Jersey Bldg. Laborers' Statewide Benefit Funds v. Newark Bd. of Education*, the defendant launched a collateral attack on the validity of an arbitration for lack of an extant arbitration agreement. *New Jersey Building*, 2013 WL 5180433, at *2 (D.N.J. Sep. 13, 2013). The Court affirmed its power to confirm the award

---

[29] I refer to this case as *Aetna* throughout the opinion. Although other cited cases include Aetna as a party, I will refer to them in short form differently.

[30] PAB, at 10 (citing *GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821, at *10 (D.N.J. Sep. 8, 2023)).

because the parties signed a Collective Bargaining Agreement, which permitted Trustees to "collect delinquent funds through arbitration," and the agreement designated a "permanent arbitrator to hear and determine collection disputes. *Id.* at *3. The District of New Jersey further confirmed that language in an agreement "indicat[ing] the award will be final and binding implicitly permits Federal court intervention to compel compliance." *Id.* (citing *Teamsters-Employer Loc. No. 945 Pension Fund v. Acme Sanitation Corp.*, 963 F. Supp. 340, 347 (D.N.J. 1997)).

SpecialtyCare puts the cart before the horse in relying on *New Jersey Building*. While the Court rearticulated the principle that an agreement to arbitrate need not explicitly include language agreeing that "a judgment of the court shall be interested upon the award made pursuant to arbitration," the Court did not waive the requirement of an arbitration agreement in the first place. 2013 WL 5180433, at *3 (citing 9 U.S.C. § 9). Unlike in *New Jersey Building*, SpecialtyCare and MedCost neither bargained for nor signed an agreement submitting to binding arbitration. No agreement exists for the Court to find implied "authority to confirm the award." *Id.* at *3.

SpecialtyCare fares no better under its second source of authority, *Cheminova A/S v. Griffin, L.L.C.* 182 F. Supp. 2d 68 (D.D.C. 2002). There, the parties entered into binding arbitration under the Federal Insecticide, Fungicide and Rodenticide

17

Act ("FIFRA"),[31] which incorporated the rules of the Federal Mediation and Conciliation Service ("FMCS").[32] FMCS Section 37(c) states that the relevant parties "shall be deemed to have consented that judgment upon the arbitration award may be entered" either in federal or state court. 29 C.F.R. pt. 1440, App. § 37(c). FIFRA permits registrants under the statute to engage in "binding arbitration proceedings," even though no private contract to arbitrate exists. 7 U.S.C. § 136a(c)(1)(F)(iii). FIFRA further provides that the arbitrator's decisions are "final and conclusive." *Id.* *Cheminova* holds that the terms "binding" and "final and conclusive" in an arbitration scheme denotes that "an award will be enforceable in court." 182 F. Supp. 2d at 73; *see Lander Co. v. MMP Investments, Inc.*, 107 F.3d 476, 480 (7th Cir. 1997) ("To agree to binding arbitration is to agree that if your opponent wins the arbitration he can obtain judicial relief if you refuse to comply with the arbitrator's award.").

While FIFRA departs from a traditional arbitration scheme because the statute's text, not a contract, gives rise to arbitration, FIFRA and the NSA materially differ, and SpecialtyCare cannot rely on *Cheminova*. First, FIFRA provides for "arbitration," rather than a generic third-party dispute resolution scheme. Second,

---

[31] 7 U.S.C. § 136, *et seq.*

[32] 7 U.S.C. § 136a(c)(1)(F)(iii)

FIFRA explicitly incorporated FMCS rules, which give rise to judicial review or confirmation of the arbitrator's award. Third, the statute employed the terms "binding" and "final and conclusive" regarding the arbitrator's decision under FIFRA. The NSA does state that "[a] determination of a certified IDR entity . . . shall be binding upon the parties involved," but follows such language by noting that the determination "shall not be subject to judicial review," except where FAA Section 10(a)(1)–(4) applies. The mere presence of the term "binding" cannot give rise to an entire arbitration scheme subject to judicial review when the plain text of the statute rebuts such reading.[33] *But see GPS of N.J.*, 2023 WL 5815821, at *10 (interpreting the presence of the "binding" language in the NSA to indicate that "the decision is to be 'final and binding,' and gives the court the authority to confirm the award.").[34]

---

[33] Both Federal and Delaware law dictate that the Court must read statutes as a whole and not interpret provisions to create internal contradictions. *See Coastal Barge Corp. v. Coastal Zone Indus.*, 492 A.2d 1242, 1245 (Del. 1985) ("[E]ach part or section [of a statute] should be read in light of every other part or section to produce an harmonious whole."); *Maracich v. Spears*, 570 U.S. 48, 68 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory. [T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.") (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180 (2012)). This is the "Harmonious-Reading Canon." *See* William N. Eskridge, Jr. & Philip P. Frickey, *Foreword: Law as Equilibrium*, 108 HARV. L. REV. 26, 98 (1994) ("Avoid interpreting a provision in a way that would render other provisions of the Act superfluous or unnecessary.") (internal citations omitted).

[34] I express my respectful disagreement with *G.P.S.*'s construction of the NSA *infra*.

Given the absence of a written agreement between the parties to arbitrate, the IDR process is not an arbitration and consequently the Court of Chancery lacks jurisdiction under 10 *Del. C.* § 5102 to confirm the IDR entity's award.[35]

## 2. The NSA fails to provide a private right of action for confirmation of IDR awards.

SpecialtyCare contends that the NSA impliedly incorporates Section 9 of the FAA, which provides a cause of action to the prevailing party in an arbitration to seek a judgment confirming the arbitrator's award. The text and structure of the NSA does not favor SpecialtyCare's reading. Both Federal and Delaware canons of statutory interpretation disfavor finding implied private rights of action in comprehensive schemes. Such canons as applied to the NSA instruct the Court to reject SpecialtyCare's argument.

### a. Statutory intent determines the existence of an implied private right of action.

Congress must create private rights of action to "enforce federal law." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)). Without an express private right of action within a statute, "the judicial task is to interpret the statute Congress has passed to

---

[35] Even if FAA Section 9 were to apply here, which it does not, the Court of Chancery would lack jurisdiction because the federal statute provides that default jurisdiction lies with the appropriate federal district court.

determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286 (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)). "Statutory intent is determinative" on this point. *Sandoval*, 532 U.S. at 286.

The Court examines statutory text to discern whether it "unambiguously confer[s] an enforceable right upon the [statute's] beneficiaries." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 281 (2002) (quoting *Suter v. Artist M.*, 503 U.S. 347, 363 (1992)). The inquiry for statutory intent "begins with the text and structure of the statute . . . and ends once it has become clear that Congress did not provide a cause of action." *Sandoval*, 532 U.S. at 288 n.7 (citing *Northwest Airlines, Inc. v. Transp. Workers*, 451 U.S. 77, 94 n.31 (1981)).

Delaware has historically followed the Supreme Courts's lead in determining whether a statute gives rise to an implied private right of action. For several years, the Delaware Supreme Court adopted the multi-factor test articulated in *Cort v. Ash*.[36] *See Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1064 (Del. 1986) (reciting

---

[36] 422 U.S. 66 (1975). In *Cort*, the Supreme Court enumerated four factors: (1) whether the plaintiff was "one of the class for whose especial benefit the statute was enacted"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such remedy or to deny one"; (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff"; and (4) whether the cause of action is one "traditionally relegated to state law . . . so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 78 (internal citations omitted). Delaware has consolidated this analysis into three factors. *See supra*.

three *Cort* factors: "the language and focus of the statute, the legislative history, and [its] underlying purposes.") (internal citations omitted). Following the decision in *Sandoval*, Delaware courts have identified the second *Cort* factor, statutory intent, as "usually dispositive under contemporary analysis." *Reylek v. Albence*, 2023 WL 8850074, at *4 (Del. Super. Dec. 21, 2023).[37]

In *Sandoval*, the Supreme Court held that Title VI of the Civil Rights Act lacked an implied private right of action to enforce regulations promulgated under Section 602. 532 U.S. at 293. There, plaintiffs sued the Alabama Department of Public Safety for violation of Title VI for adopting a policy administering driver's license examinations only in English. *Id.* at 278. The DOJ adopted a regulation "forbidding [Department of Transportation] funding recipients to 'utilize criteria or methods of administration which have the effect of subjecting individuals to

---

[37] The Delaware Supreme Court has not yet explicitly adopted the *Sandoval* standard, but lower courts have predicted such adoption to be likely. *See Rays Plumbing & Heating Serv., Inc. v. Stover Homes, L.L.C.*, 2011 WL 3329384, at *2 (Del. Super. July 26, 2011) ("Delaware has not adopted the [*Sandoval*] standard yet; however, a Delaware Court of Chancery decision found that the Delaware Supreme Court will likely embrace the newer federal standard at the first opportunity because State law in this area has traditionally tracked Federal law.") (citing *O'Neill v. Town of Middletown*, 2006 WL 20507, at *19 (Del. Ch. Jan. 18, 2006)). In *O'Neill*, Vice Chancellor Noble focused on the second *Cort* factor following the *Sandoval* decision, noting that "the Court should also address the United States Supreme Court's current implied private right of action doctrine because Delaware courts have historically hewn closely to the analyses of the United States Supreme Court in this context." 2006 WL 205071, at *19 (citing *Lock v. Shreppler*, 426 A.2d 856, 864 (Del. Super. 1981) (superseded by statute)).

discrimination because of their race, color, or national origin . . . .'" *Id.* (quoting 28 C.F.R. § 42.104(b)(2) (2000) (effectuating the antidiscrimination provision of Title VI, Section 601)). While Section 601 prohibited discrimination on the basis of race or nationality, and Section 602 permitted the DOJ to promulgate regulations, Title VI lacked a provision providing a private right of action for violation of such regulations. *Sandoval*, 532 U.S. at 278–79. Instead, Section 602 provided an alternative means of enforcement—permitting agencies to "terminat[e] funding to the 'particular program, or part thereof,' that has violated the regulation . . . ." *Id.* at 289 (quoting 42 U.S.C. § 2000d–1).

*Sandoval*'s inquiry begins and ends "with the text and structure of [the Statute." Section 602 lacked the required "rights-creating" language that would permit the Court to infer a private right of action. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979) ("Not surprisingly, the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action."). Instead, Section 602 conferred power on the DOJ to promulgate regulations enacting Section 601's anti-discrimination regime. *See Sandoval*, 532 U.S. at 189 ("Far from displaying congressional intent to create new rights, § 602 *limits* agencies to 'effectuat[ing]' rights already created by § 601.") (emphasis added).

23

Further, the Court disfavored implying a private right of action where the parties benefiting from the statute are "twice removed" from the statute's focus. *Id.* For example, Section 601 seeks to benefit persons subject to discrimination on the basis of race or national origin. Section 602, however, speaks to a federal agency's authority to effectuate regulations that implement Section 601. Such attenuation is highly probative of Congress's intent to not provide an implied private right of action. *Cf. Cannon*, 441 U.S. at 690–91 (buttressing its finding of an implied private right of action where the statute "expressly identifie[d] the class Congress intended to benefit").

Finally, the presence of an explicit remedy in a statute's text confirms that Congress did not intend to impliedly create a distinct remedy. Section 602 permits the government to enforce its regulations by removing funding where a program violates Title VI. *Sandoval*, 532 U.S. at 290 (noting that "these elaborate restrictions on agency enforcement . . . tend to contradict a congressional intent to create privately enforceable rights . . . ."). Yet another fundamental canon of statutory construction states that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979); *accord Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–20 (1981) (foreclosing an express Section 1983 remedy where the relevant federal statute's "remedial

24

devices" were sufficiently comprehensive, indicating Congress's intent to preclude other, applicable remedies). Moreover, as an exercise of this Court's prudence, "[t]he judiciary may not . . . fashion new remedies that might upset carefully considered legislative programs" where Congress has "enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO*, 451 U.S. 77, 97 (1981).

Fortuitously, several federal District Courts have ruled on the very legal question presented by SpecialtyCare.[38] Regrettably, such opinions are divided. One line of decisions hews closely to the strict textualism of *Sandoval*, declining to find an implied private right of action in the NSA. The other line reprises a more capacious approach to the statute, identifying rights-creating language within the NSA and permitting an implied private right of action. In accordance with principles of Federal and Delaware statutory interpretation, I adopt the former approach.

MedCost relies on a recent decision out of the Middle District of Florida, rejecting any implied private right of action under the NSA. *Med-Trans Corp. v. Capital Health Plan, Inc.*, 700 F. Supp. 3d 1076, 1082 (M.D. Fla. 2023). There, the Court rejected two theories: (1) that the NSA incorporated the FAA's procedural

---

[38] The parties did not identify, and I am unaware of any state courts that have issued decisions on the matter.

25

rules, and (2) that the FAA presumptively applies to the NSA's IDR process. *See id.* at 1082–84. *Med-Trans* rejects the first theory because the NSA incorporated only Section 10 of the FAA. Applying the "cardinal canon" that "courts presume that a legislature says in a statute what it means and means in a statute what it says there," the Court concluded that inclusion of one provision of the FAA to the exclusion of all others meant that the provisions of the FAA permitting a party to challenge an award do not apply under the NSA. *Id.* at 1083 (citing *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 969 (11th Cir. 2016)). As for the second theory, *Med-Trans* rejected that the FAA "presumptively" applied to NSA IDR determinations because IDR is not an arbitration. *See id.* at 1083–84 (noting that the FAA requires an agreement, i.e., contract, to arbitrate); *see also supra* § II.A.1.

One year following the *Med-Trans* decision, the Northern District of Texas adopted a similar rationale in declining to find an implied private right of action in the NSA. *Guardian Flight LLC v. Health Care Serv. Corp.*, 735 F. Supp. 3d 742 (N.D. Tex. 2024), *aff'd*, 140 F.4th 271 (5th Cir. 2025). *Guardian Flight LLC* relied on *Sandoval*'s logic in noting that the NSA lacks language "establishing that Congress intended to create a remedy for out-of-network providers." *Id.* at 750 (stating a *Sandoval* remedy denotes a "procedural cause of action, *not* the substantive remedy.") (emphasis in original) (citing *Diagnostic Affiliates of Ne. Houston, LLC*

26

*v. Aetna, Inc.*, 654 F. Supp. 3d 595, 610 (S.D. Tex. 2023)).[39] Not only does the NSA decline to incorporate FAA Section 9, but it also lacks "any fee-shifting provisions or any other language suggesting that Congress intended to confer a private cause of action to healthcare providers." *Guardian Flight LLC*, 735 F. Supp. 3d at 750.[40]

In the Fifth Circuit's affirmance of the District Court decision, the court noted the heavy burden placed upon plaintiffs to "overcome [the] presumption" that Congress "did not intend to create any private cause of action." 140 F.4th at 275 (citing *Sigmon v. Southwest Airlines Co.*, 110 F.3d 1200, 1205 (5th Cir. 1997)). The Circuit Court disclaimed any distinction between judicial enforcement of an IDR award and judicial review of such an award. 140 F.4th at 275 ("The term 'judicial review' is broad enough to include a court's order to enforce an IDR award."); *see*

---

[39] *Guardian Flight* rejected two arguments that the NSA created rights (and impliedly a remedy). The NSA states that IDR determinations "shall be binding," 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I), and requires payment within thirty days, *id.* § 300gg-112(b)(6). "[W]hen read together, [these provisions] do not suggest that Congress intended to create a procedural mechanism for providers to convert IDR awards to final judgments." *Guardian Flight LLC*, 735 F. Supp. 3d at 751.

[40] *Guardian Flight* juxtaposes the NSA with Title IX of the Civil Rights Act, which the Supreme Court determined to include an implied private right of action. 735 F. Supp. 3d at 750; *see Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979). *Cannon* relied on Title IX's attorneys' fee-shifting provisions to infer the existence of a private right of action, thereby holding the statute's text indicated that Congress's intent to create a private cause of action. *See id.* at 699–700. The NSA lacks such language. Moreover, *Sandoval*'s rigid skepticism departs from the more pliable *Cort v. Ash* factor-based approach. *See* Anthony J. Bellia Jr., *Justice Scalia, Implied Rights of Action, and Historical Practice*, 92 NOTRE DAME L. REV. 2077, 2086–87 (2017).

*Concrete Pipe & Products of California v. Constructions Laborers Pension Trust for Southern California*, 508 U.S. 602, 611 (1993) (interpreting an ERISA provision that "provides for judicial review of the arbitrator's decision by an action in the district court to enforce, vacate or modify the award.").

SpecialtyCare relies on two decisions arriving at the opposite conclusion. The most substantive is *Guardian Flight LLC v. Aetna Life Insurance Co.*, 789 F. Supp. 3d 214 (D. Conn. 2025).[41] There, the Court rejected the argument that the NSA's failure to incorporate FAA Section 9 proscribes judicial review. Instead, because IDR determinations are automatically binding and trigger immediate payment obligations, "there is no reason for the NSA to reference" Section 9. *Id.* at 227.[42]

*Aetna* further reads the NSA's proscription on judicial review as only barring vacatur of an IDR determination for reasons not enumerated within FAA Section 10(a). *Id.* at 227 ("Courts cannot vacate or entertain collateral attacks on these awards—even those that would fall within the FAA's narrow scope of review."). But, per *Aetna*, the NSA's binding language and Timing of Payment provisions do

---

[41] *See* PAB, 9–15.

[42] Even if I were to adopt *Aetna*'s logic, the law would still compel me to dismiss this case for want of subject matter jurisdiction. *Aetna* distinguishes arbitrations and the IDR process with great care. *See* 789 F. Supp. 3d at 227. As explained *supra*, this Court lacks jurisdiction to enforce a third-party dispute resolution outside the arbitration context. *See* 10 *Del. C.* § 5702(a).

comprise clear rights-creating language, which in turn reflects "'congressional intent to create both a right *and a remedy*' for the individuals to whom payment is due." *Id.* at 228 (emphasis in original) (citing *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020)). Pursuant to this logic, *Aetna* interprets the NSA to permit judicial action to enforce the awards (confirming their "binding" nature) and to proscribe judicial interference with their finality, excepting the FAA Section 10(a) context.

Finally, *Aetna* contends that failure to permit an implied private right of action would "render IDR awards meaningless" and create "strange asymmetries." 789 F. Supp. 3d at 228. After all, a court could intervene only in cases of fraud or corruption. *Aetna* suggests that absent a private right of action, legitimate awards lack the artillery support of judicial enforcement, but courts can easily intervene to invalidate them. Even though *Aetna* acknowledges the ability of agencies to intervene under the NSA's text, "[these] statutory provisions . . . do not empower agencies to enforce individual IDR awards or to hold health plans and insurers accountable for untimely payments. *Id.* at 229.

SpecialtyCare also relies on *GPS of New Jersey, M.D., PC v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821 (D.N.J. Sep. 8, 2023).[43] There, the Court

---

[43] *See* PAB, 10.

heard cross motions to vacate and to confirm the IDR determination. Notably, the *GPS* Court did not consider whether the IDR process differs from arbitration. *See id.* at \*10 ("[U]nless the arbitration award is vacated pursuant to [FAA] Section 10 or modified or corrected under Section 11 . . . the award 'must' be confirmed.") (quoting 9 U.S.C. § 9). After concluding that defendants did not meet the FAA Section 10(a) standard to vacate the IDR determination, *GPS* held that the court "must" confirm the award, relying on the "final and binding" rationale for court intervention. *Id.* at \*10 (quoting *New Jersey Buildings Laborers' Statewide Benefit Funds v. Newark Bd. of Education*, 2013 WL 5180433, at \*3 (D.N.J. 1997) ("language [in 9 U.S.C. § 9] that indicates the award will be final and binding implicitly permits Federal court intervention to compel compliance.")).

Plaintiff cannot both argue that (1) IDR determinations are self-enforcing, unlike arbitrations, and thus have no need for Section 9's confirmation provisions (*Aetna*), and (2) the Court "must" confirm the determination because it is final and binding (*GPS*). *See T.V. Seshan M.D., P.C. v. Blue Cross Blue Shield Assoc.*, 2025 WL 3496382 (rejecting a comparable argument where the plaintiff relied on both *GPS* and *Aetna*); *see also Med-Trans Corp.*, 700 F. Supp. 3d at 1084 (stating that *GPS* "had no need to grapple with the broader applicability of the FAA to the NSA" because the parties assumed Section 9's applicability).

30

Not only is Plaintiff's position contradictory, but even taken in the alternative, the NSA's text vitiates neither argument. Under a line of precedent stretching from *Cannon* to *Sandoval*, "An implied right of action is incongruous with such a detailed statutory scheme, in which judicial review is limited to specific instances." *FHMC LLC v. Blue Cross and Blue Shield of Arizona Inc.*, 2024 WL 1461989, at *3 (D. Ariz. Apr. 4, 2024). An alternate enforcement scheme exists under the NSA and federal agencies appear prepared to act under the statute. *See, e.g.*, Ellen Montz, Department of Health & Human Services: Centers for Medicare & Medicaid Services (Feb. 23, 2022), https://www.cms.gov/files/document/caa-enforcement-letters-arizona.pdf ("CMS will enforce the outcome of the federal independent dispute resolution process for such cases in Arizona."). As in *Sandoval*, the statute contains a regulatory enforcement mechanism, which means that Congress considered how to redress violations of the text's requirement. Furthermore, the NSA incorporates a remedy (FAA Section 10) to the exclusion of others. SpecialtyCare's argument that failure to recognize an implied private right of action would result in the NSA's unenforceability fails for one simple reason: Congress included remedial provisions. SpecialtyCare's dissatisfaction with the statutory scheme cannot compel the Court to craft an additional remedy by judicial fiat. Accordingly, I must dismiss Counts I and II.

**B. SpecialtyCare's causes of action in the alternative to the NSA fail to state a claim.**

Pleading in the alternative to its NSA claims, SpecialtyCare brings a bundle of legal and equitable claims: Account Stated (Count III), Quantum Meruit (Count IV), and Unjust Enrichment (Count V). Having rejected the NSA claims, I must now turn to Counts III–V to determine whether SpecialtyCare's pleading overcomes MedCost's 12(b)(6) challenge. It does not and Counts III–V are dismissed.

**1. Delaware disfavors Accounts Stated Claims and no such account exists between the parties. Count III is dismissed.**

To establish a claim for account stated, a plaintiff must allege and prove three essential elements: (1) an account existed between the parties; (2) the defendant stated or admitted to owing a specific sum on account to the plaintiff; and (3) the defendant made this admission after the original account or debt was created. *Sparebank 1 SR-Bank ASA v. Wilhelm Maass GMBH*, 2019 WL 6033950, at *6 (Del. Super. Nov. 5, 2019). When a party brings a claim for account stated, it can only recover by showing both the account and an unqualified assent of defendant to its correctness. *Shea v. Kerr*, 40 A. 241 (Del. Super. 1898); *see Sparebank*, 2019 WL 6033950, at *7 ("[The] complaint must provide facts that the defendant stated or admitted to owing a specific sum on the account to the plaintiff.") (internal citations omitted). Account stated is a legal theory where one party's "stating" of the account comprises consideration for the promise to pay, thereby creating a new contract

"chang[ing] the character of the original debt." *Baliezewski v. Putzcus*, 132 A.217, 218 (Del. Super. 1926) (citing *Chambers v. Fennemore's Adm'r*, 4 Del. 368, 371 (Del. Super. 1846)).

SpecialtyCare's pleading for account stated does not state a claim. Notably, the pleading fails to plausibly allege that MedCost admitted to owing any debt to SpecialtyCare. SpecialtyCare infers such an account by the fact that it "rendered OON services and items" to MedCost's members and that MedCost was "obligated to provide coverage for" SpecialtyCare's services.[44] SpecialtyCare further avers that MedCost's "knowledge, acceptance, and retention" of such benefits conferred comprises acknowledgment of a debt owed.[45] Finally, SpecialtyCare references the NSA procedure of (1) submitting claims to MedCost and (2) entering into the IDR determination, which ultimately comprises the account.

The pleaded facts and context of the NSA contradict SpecialtyCare's theories. First, even if MedCost accepted and received a benefit from SpecialtyCare's services, such allegations do not adequately plead the existence of an account. Our law contemplates an express agreement "subsequent to the creation of the debt" stating that the debtor owes a certain sum. *See Chrysler Corp. v. Airtemp Corp.*, 426

---

[44] Compl., ¶¶ 42, 44.

[45] *Id.*, ¶¶ 48, 50.

33

A.2d 845, 849 (Del. Super. 1980). In addition to a subsequent agreement, SpecialtyCare must "provide facts that the defendant stated or admitted to owing a specific sum on the account to the plaintiff." *Citibank (South Dakota) N.A. v. Santiago*, 2012 WL 592873, at *2 (Del. C.P. Feb. 23, 2012). The pleadings lack any allegation of the existence of a subsequent agreement or MedCost's admission of a debt owed.

Second, the NSA context specifically rebuts the possibility of an account stated claim. The NSA redressed problems arising from OON claims. Because this dispute arises from the previous IDR determination, SpecialtyCare does not operate within MedCost's preferred provider network and that no account existed between the parties.[46]

Because SpecialtyCare has failed to reasonably plead the elements of an account stated claim, Count III is dismissed.

---

[46] *See* Compl. ¶ 8; DOB, at 13. The NSA operates in the context where no contractual relationship existed between the insurer and medical provider. It is difficult to conceive how the NSA could apply in a context that gives rise to an account stated claim. While MedCost argues that it was never involved in the IDR proceedings, its support from this claim lies beyond the complaint and incorporated exhibits and thus cannot be considered at the Motion to Dismiss stage. *See* DOB, 13. That said, I decline to hold that participation in an IDR proceeding constitutes adequate pleading of "agreement" or "acknowledgement" of a debt sufficient for an account stated claim.

### 2. Because MedCost as an insurer received no benefit from SpecialtyCare's's services, the claims for quantum meruit and unjust enrichment are dismissed.

Both of SpecialtyCare's equitable claims, quantum meruit and unjust enrichment, require one party to confer a benefit to another. A party may recover under a theory of quantum meruit where (1) "the party performed the services with the expectation that the recipient would pay for them"; and (2) "the recipient should have known that the party expected to be paid." *Endowment Rsch. Gp., LLC v. Wildcat Venture P'rs, LLC*, 2021 WL 841049, at *13 (Del. Ch. Mar. 5, 2021). A claim lies for unjust enrichment where the claimant pleads "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.* (citing *Nemec v. Shrader*, 991 A.3d 1120, 1130 (Del. 2010)).[47]

The parties' briefs focus on whether "providing services to an insured . . . benefit[s] the insurer in a way that sustains a quasi-contract claim."[48] MedCost relies

---

[47] While the briefing refers to the two causes of action as quasi-contract claims, they are distinct. Quantum meruit is "a principle of restitution arising from a cause of action in quasi-contract," whereas unjust enrichment is a cause of action "usually but not always equitable, based on an unjustified enrichment of one party and resulting impoverishment of another party, in the absence of a remedy at law." *Hynansky v. 1492 Hosp. Gp.*, 2007 WL 2319191, at *2 (Del. Super. Aug. 15, 2007) (citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999)).

[48] DOB, 15. MedCost also argued that SpecialtyCare provided services to MBS, not MedCost. Such argument relies on facts beyond the pleadings, and I decline to entertain this line of argument at the Motion to Dismiss stage. *See* PAB, 20.

on a series of cases holding that an insurer does not receive a benefit where services are "rendered to an insured, because those services aren't directed to or for the benefit of the insurer." *Angelina Emergency Med. Assocs. PA v. Health Care Servs. Corp.*, 506 F. Supp. 3d 425, 532 (N.D. Tex. 2020); *see, e.g.*, *Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co.*, 2019 WL 1916205, at *8 (D.N.J. Apr. 30, 2019) ("District courts have consistently dismissed unjust enrichment claims under substantially similar circumstances, reasoning that, if anything, the benefit is derived *solely by the insured party*.") (emphasis added).

In response, SpecialtyCare cites a recent line of cases holding that an unjust enrichment claim may lie against an insurer because "the benefit conferred . . . is not the provision of the healthcare service *per se*, but rather the discharge of the obligation." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240 (3d Cir. 2020); *see MedWell, LLC v. Cigna Corp.*, 2021 WL 2010582, at *4–5 (D.N.J. May 19 2021) (applying *Plastic Surgery*).

Neither party briefed Delaware law on whether an insurer receives a benefit when the insured is provided health care services, likely because no Delaware case is squarely on point. Thus, I am forced to look at authority outside of Delaware to consider its persuasiveness. I first note that *Plastic Surgery*'s permissiveness in permitting quasi-contract claims against insurers in this context appears to be the minority rule. *See, e.g.*, *Abira Med. Lab'ys LLC v. Blue Cross Blue Shield of Ariz.*

36

*Inc.*, 2025 WL 1000739, at \*9 (D. Ariz. Apr. 3, 2025) (collecting cases declining to recognize a benefit conferred to an insurer because of a discharged obligation to pay medical expenses). Moreover, *Plastic Surgery*, (1) applied New Jersey Law, (2) involved especial duties imposed on the insured, and (3) reckoned with ERISA preemption. I decline to depart from the majority rule to hold that payment of an insured's medical expenses confers a benefit on an insurer, especially where a comprehensive federal statutory program creates a procedure with prescribed remedies in this specific context.

Because SpecialtyCare failed to plead that MedCost received an "enrichment" by virtue of insured parties receiving out of network medical coverage (unjust enrichment) or that MedCost should have known that SpecialtyCare would bear the costs of these services (quantum meruit), Counts IV and V are dismissed. Given the novel, undeveloped legal theories at issue here, however, I dismiss these counts without prejudice.[49]

## III. CONCLUSION

Counts I and II are DISMISSED with prejudice because this Court lacks subject matter jurisdiction and, in the alternative, SpecialtyCare has failed to state a claim for this Court's confirmation or enforcement of IDR proceedings. Count III

---

[49] Plaintiff may well wish to bring these claims with targeted pleading and more developed briefing sufficient to advance an issue of first impression in Delaware.

is DISMISSED with prejudice because SpecialtyCare failed to state a claim for account stated.  Counts IV and V are DISMISSED without prejudice.  This is my final report, and exceptions may be filed under Court of Chancery Rule 144.